**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAX A. RADY,

        Plaintiff,

            v.

THE BOSTON CONSULTING GROUP, INC.
and De BEERS UK LIMITED,

        Defendants.

Case No.: 1:20-cv-02285 (ALC)

Judge Andrew L. Carter, Jr.

## <u>DEFENDANT DE BEERS UK LIMITED'S OPENING BRIEF IN SUPPORT OF ITS RULE 12(B)(6) MOTION TO DISMISS</u>

# TABLE OF CONTENTS

I.    Introduction ................................................................................................ 1

II.   Legal Standard ........................................................................................... 1

III.  Argument .................................................................................................... 3

    A.    The claims fail step one of the *Alice* test. ............................................. 3

        1.    Collecting, processing, and storing information is a patent-ineligible abstract idea. .............................................................. 3

        2.    Tracking physical items is a patent-ineligible abstract idea. ....................... 4

        3.    Hardware does not make the claims of the '250 patent any less abstract. ................................................................................. 6

        4.    The differences between the claims are inconsequential because all claims are directed to the same abstract idea. ............................................. 7

    B.    The claims fail step two of the *Alice* test. ............................................. 9

        1.    The claims do not purport to improve computers themselves. .................. 9

        2.    The dependent claims do not recite an inventive concept. ...................... 13

        3.    No disputed facts preclude finding that the claims lack an inventive concept at this stage. .............................................................. 17

IV.   Conclusion ................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) .................................................................................................. *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................1

*Automated Tracking Sols., LLC v. Coca-Cola Co.*,
  723 F. App'x 989 (Fed. Cir. 2018) ...........................................................................10, 11

*Baxter Healthcare Corp. v. Becton, Dickinson & Co.*,
  No. 17-CV-2186 JLS (RBB), 2018 WL 6220132 (S.D. Cal. Sept. 5, 2018) .........................19

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................1

*In re: Bill of Lading Trans. and Proc. Sys. Patent Lit.*,
  No. 1:09-md-2050, 2016 WL 4505767 (S.D. Ohio Aug. 29, 2016) .........................................4

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ........................................................................................................3

*Bozeman Fin. LLC v. FRB of Atlanta*,
  955 F.3d 971 (Fed. Cir. 2020) .....................................................................................5, 9

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019) ........................................................................................18

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) .....................................................................................3, 4

*Cook Biotech Inc. v. Acell, Inc.*,
  460 F.3d 1365 (Fed. Cir. 2006) ........................................................................................13

*D&M Holdings Inc. v. Sonos, Inc.*,
  No. 16-141-RGA, 2017 WL 1395603 (D. Del. Apr. 18, 2017) .............................................2

*Digitech Image Techs., LLC v. Electronics for Imag., Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014) .....................................................................................6, 7

*Electric Power Group, LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed Cir. 2016) .....................................................................................3, 11

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) ................................................................ 2, 3, 11

*Epic IP LLC v. Backblaze, Inc.*,
   351 F. Supp. 3d 733 (D. Del. 2018) ................................................................ 19

*Genetic Techs. Ltd. v. Merial L.L.C.*,
   818 F.3d 1369 (Fed. Cir. 2016) ................................................................ 1, 14

*Intellectual Ventures I LLC v. Capital One Financial Corporation*,
   850 F.3d 1332 (Fed. Cir. 2017) ................................................................ 5

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
   200 F.Supp.3d 565 (W.D. Pa. 2016) ................................................................ 13

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
   711 F. App'x 1012 (Fed. Cir. 2017) ................................................................ 13

*Intellectual Ventures I LLC v. Symantec Corp.*,
   725 F. App'x 976 (Fed. Cir. 2018) ................................................................ 18

*Intellectual Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016) ................................................................ 14

*Parker v. Flook*,
   437 U.S. 584 (1978) ................................................................ 14

*PerkinElmer, Inc. v. Intema*,
   496 F. App'x 65 (Fed. Cir. 2012) ................................................................ 7

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
   855 F.3d 1322 (Fed. Cir. 2017) ................................................................ 7

*Smartflash LLC v. Apple Inc.*,
   680 F. App'x 977 (Fed. Cir. 2017) ................................................................ 9

*TDE Petroleum Data Sols. v. AKM Enter., Inc.*,
   657 F. App'x 991 (Fed. Cir. 2016) ................................................................ 3

*In re TLI Commc'ns LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016) ................................................................ 4, 13

*Virginia Inn. Scis., Inc. v. Amazon.com, Inc.*,
   227 F. Supp. 3d 582 (E.D. Va. 2017) ................................................................ 13

**Statutes and Rules**

35 U.S.C. § 101 ................................................................ *passim*

Fed. R. Civ. P 12(b)(6)...................................................................................................................1

## I.      **Introduction**

Plaintiff's patent infringement claim (Count I) should be dismissed under Fed. R. Civ. P

12(b)(6) because all claims of the asserted patent ("the '250 patent") are invalid under 35 U.S.C.

§ 101.  The claims fail the two-part test for subject matter eligibility, as they: (1) are directed to

an abstract idea, and (2) contain no inventive concept.  *See Alice Corp. Pty. Ltd. v. CLS Bank*

*Int'l*, 134 S. Ct. 2347, 2356-57 (2014).

First, the claims of the '250 patent are directed to the patent-ineligible abstract idea of

collecting, processing, and storing data to track physical items.  Courts have routinely found

similar claims directed to patent-ineligible abstract ideas.

Second, the claims of the '250 patent lack an inventive concept that could transform the

abstract idea into patent-eligible subject matter.  The claims do not improve anything about

computer technology itself.  In fact, the specification of the '250 patent confirms the

conventional nature of the claimed elements.

## II.     **Legal Standard**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a

pleading for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

When reviewing a motion to dismiss under Rule 12(b)(6), a court must accept all factual

allegations in the pleading as true and determine whether they plausibly give rise to an

entitlement to relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 555-56 (2007).  However, a court need not credit a pleading's "bare

assertions," "bald allegations," or other "conclusory" statements.  *Iqbal*, 556 U.S. at 681.

A court may grant a motion to dismiss under Rule 12(b)(6) when an asserted patent fails

to claim eligible subject matter under 35 U.S.C. § 101.  *See Genetic Techs. Ltd. v. Merial L.L.C.*,

818 F.3d 1369, 1380 (Fed. Cir. 2016).  The Supreme Court established a two-step framework for

determining eligibility in *Alice*. Under step one of *Alice*, a court must determine whether the claims are directed to a patent-ineligible concept, such as an abstract idea. 134 S.Ct. 2347 at 2355. The Supreme Court has not "delimit[ed] the precise contours of the 'abstract ideas' category" (*id*. at 2357), but "courts have generally sought to 'compare claims at issue to those claims already found to be directed to an abstract idea in previous cases.'" *D&M Holdings Inc. v. Sonos, Inc*., No. 16-141-RGA, 2017 WL 1395603, at *3 (D. Del. Apr. 18, 2017), quoting *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1334 (Fed. Cir. 2016).

If the claims are directed to an abstract idea, the court must turn to step two of *Alice* and examine whether the claims include an "inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (internal quotation marks omitted). The Supreme Court set forth a few guiding principles for *Alice* step two. First, even if a claim is tied to a particular machine, that alone does not confer eligibility. *Id*. at 2358 ("[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."); *see CyberSource Corp. v. Retail Decisions,* Inc, 654 F.3d 1366, 1375 (Fed. Cir. 2011) ("[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine 'must impose meaningful limits on the claim's scope.'") (citation omitted). Second, "[s]imply appending conventional steps, specified at a high level of generality," does not supply an "inventive concept" that transforms an abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2357 (citation omitted); *see also id.* at 2359 (finding that "well-understood, routine, conventional activity" does not supply an "inventive concept"). Third, an abstract idea cannot be transformed into patent-eligible subject matter by limiting it to a "particular technological environment" or

adding "insignificant postsolution activity." *Id*. at 2358; *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010) (citation omitted).

Applying that guidance, the Federal Circuit has looked for "a specific improvement in the way computers operate" to determine whether claims satisfy step two of the *Alice* test. *Enfish*, 822 F.3d at 1336.

**III.    Argument**

   **A.    The claims fail step one of the *Alice* test.**

The claims here are directed to the patent-ineligible abstract idea of collecting, processing, and storing information to track physical items.

   **1.    Collecting, processing, and storing information is a patent-ineligible abstract idea.**

The claims of the '250 patent focus on collecting, processing, and storing information, which the Federal Circuit has consistently found to be a patent-ineligible abstract idea. *See, e.g.*, *TDE Petroleum Data Sols. v. AKM Enter., Inc*., 657 F. App'x 991, 992-93 (Fed. Cir. 2016) (finding claim directed to abstract idea of "storing data, receiving data, and using mathematics on a computer to organize that data and generate additional information," *i.e.*, a "gathering and processing claim"), citing *Electric Power Group, LLC v. Alstom S.A*., 830 F.3d 1350, 1353 (Fed Cir. 2016) (finding claims reciting "collecting information, analyzing it, and displaying certain results of the collection and analysis" are "a familiar class of claims 'directed to' a patent-ineligible concept.") (citations omitted).

For example, in *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014), the claims recited a method that involved extracting data from documents using an automated digitizing unit such as a scanner. The Court found the claims directed to an abstract idea of "1) collecting data, 2) recognizing certain data within the

collected data set, and 3) storing that recognized data in a memory." *Id.* at 1347.  Similarly, in *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016), the claims recited a "method for recording and administering digital images," which involved "recording images using a digital pick up unit in a telephone unit," digitally storing them, transmitting the digital images and classification information to a server, and storing the digital images in the server based on the classification information.  The Court found those claims directed to an abstract idea of "classifying and storing digital images in an organized manner."  *Id.* at 611.

The claims here involve recording to a blockchain unique identifiers of physical items, and they mirror the data collecting, processing, and storing claims held invalid in the cases above.[1]  First, the claims of the '250 patent involve *collecting* spectral analysis data and 3D scan data.  (*See* Dkt. 30 Ex. A at 19:23-28.)  Second, the claims involve *processing* that data by generating a unique signature and comparing it against previously-recorded unique signatures, similar to steps of "recognizing certain data" and "classifying" data in *Content Extraction* (776 F.3d at 1347) and *TLI* (823 F.3d at 613), respectively.  (*See* Dkt. 30 Ex. A at 19:29-48.)  Third, the claims involve *storing* data by recording it to the blockchain.  (*Id.* at 19:49-51.)

### 2.    Tracking physical items is a patent-ineligible abstract idea.

The claims are directed to collecting, processing, and storing data for the purpose of tracking "physical item(s)" but that does not make them any less abstract.  For example, in its response to De Beers's letter for a pre-motion conference, Plaintiff alleged that the claims "solved the very difficult, and previously unsolved problem of how to establish and track the

---

[1] The '250 patent explains that blockchains implement ledgers (*see, e.g.,* Dkt. 30 Ex. A at 1:6-7), which Courts have found to be a patent-ineligible abstract idea.  *See* Section III(B)(1), below.  The '250 patent also makes clear that blockchains were well-known in the art, *i.e.*, blockchains were not inventive.  *See id.*

provenance of . . . physical items." (Dkt. 24 at 2.) Merely solving a problem in the "physical" realm, however, does not negate the underlying abstraction. *See TDE Petroleum*, 657 F. App'x at 992-93 (finding claim relating to "well operation" directed to abstract idea)

Indeed, the Federal Circuit has found "tracking" claims that resemble the claims here directed to a patent-ineligible abstract idea. *See Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989 (Fed. Cir. 2018). The patent in *Automated Tracking* related to systems for "locating, identifying, tracking, and surveilling objects," just as the '250 patent relates to tracking objects. *Id*. at 991. The asserted claim in *Automated Tracking* recited a reader (scanner) that acquires data, similar to the imaging device that is configured to determine spectral analysis data and 3D scan data in the claims of the '250 patent. *Id*. at 991-92 & n.2. The claim in *Automated Tracking* further recited a transponder that transmits data, like the communications subsystem communicates data in the claims of the '250 patent. *Id*. at 992. The claim in *Automated Tracking* also recited a processor configured to analyze the data and generate detection information associated with a first and second sighting of an object, like the "processing devices" in the claims of the '250 patent configure the network node to analyze data and determine a unique signature that is compared against previous unique signatures. *Id*. at 992. Finally, the claim in *Automated Tracking* recited storing the detection information, like the recording of the instance of the physical item in the claims of the '250 patent. *Id.* Yet neither the physical components nor the "tracking" problem that they purportedly solved saved the *Automated Tracking* claim under step one of *Alice. Id.* (affirming finding that claim was directed to the abstract idea of "collecting data, analyzing it, and determining the results based on the analysis of data").

### 3.    Hardware does not make the claims of the '250 patent any less abstract.

Plaintiff's response to De Beers's letter for a pre-motion conference focused on the hardware limitations in the claims.  (Dkt. 24 at 2.)  But, claims directed to abstract ideas are not rendered patent-eligible merely by reciting hardware, particularly where, as here, the claims contain "vague, functional descriptions" of that hardware.  *TLI*, 823 F.3d at 615 ("[T]he 'image analysis unit' predictably analyzes the digital images . . . . And, the 'control unit' predictably 'controls' various aspects of the claimed functionality."); *In re: Bill of Lading Trans. and Proc. Sys. Patent Lit.*, No. 1:09-md-2050, 2016 WL 4505767, at *3 (S.D. Ohio Aug. 29, 2016) ("The image scanners simply scan images, the transmitters simply transmit the images, the receivers simply receive the images, and the load planning software simply extracts the data from the images and transforms the data[.]")  Claim 1, for example, recites "a *storage* device" *for* *"storing* instructions" and a "*communications* subsystem . . . *to communicate* with at least one or more other nodes."  (Dkt. 30 Ex. A at 19:17-22 (emphasis added).)  *See generally Intellectual Ventures I LLC v. Capital One Financial Corporation*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) ("Although [certain] data structures add a degree of particularity to the claims, the underlying concept embodied by the limitations merely encompasses the abstract idea itself of organizing, displaying, and manipulating data of particular documents.").

Plaintiff focuses in particular on the claimed "imaging device configured to determine spectral analysis data and 3D scan data."  (Dkt. 24 at 2.)  But Plaintiff but does not (and, as discussed in Section III(B)(1), below, could not) contend that the imaging device is anything other than the imaging devices already known in the art.  *See Bozeman Fin. LLC v. FRB of Atlanta*, 955 F.3d 971, 979 (Fed. Cir. 2020) ("[T]he use of well-known computer components to collect, analyze, and present data, in this case to verify financial transactions, does not render

these claims any less abstract."); *Alice*, 134 S.Ct. at 2358 ("The fact that [claimed components] 'necessarily exist[] in the physical, rather than purely conceptual, realm,' is beside the point.") (citation omitted).

####     4.    The differences between the claims are inconsequential because all claims are directed to the same abstract idea.

The claims of the '250 patent do not meaningfully differ under step one of *Alice*.  All three independent claims, and thus all twenty dependent claims,[2] include at their core the data collecting, processing, and storing steps discussed above.  All claims therefore are directed to that same abstract idea.  While the three independent claims (1, 12, and 22) of the '250 patent differ in some respects, those differences do not matter for subject matter eligibility.  For example, claim 1 recites a "network node," claim 12 recites a "computer-implemented method," and claim 22 recites "system."  But the Supreme Court has found those distinctions immaterial. *Alice*, 134 S. Ct. at 2359-60 (treating method and system claims the same under § 101 and warning against interpreting § 101 "in ways that make patent eligibility depend simply on the draftsman's art") (citation omitted).

Moreover, as discussed in Section III(B)(2), below, dependent claims 2, 3, 13, 14 merely recite conventional components, *e.g.*, a "cabinet," "scale," and "camera."  *See Alice*, 134 S. Ct. at 2360 (invalidating "system claims [that] recite a handful of generic computer components configured to implement the [abstract] idea").  And the remaining dependent claims recite variations on data collecting and processing:

---

[2] Plaintiff has not expressly alleged infringement of any claims of the '250 patent other than claims 1 and 12.  (*See* D.I. 30, 30-2.)  Even if he had asserted all claims, however, the result would not change, as discussed below.

- providing "reputational data" (claim 5, 6, 16, 17) and "proof of identity data" (claims 4, 15);

- providing "proof of location" data (claims 7, 18), and receiving data "with which to determine a position" (claims 8, 19);

- measuring data on "defects" (claim 11);

- analyzing and storing data on "a modified physical item" (10, 21); and

- communicating data using "short-range communications" (claims 9, 20, 23).

Even if that additional data manipulation were "novel" (which it is not) or "solved the very difficult, and previously unsolved problem" (which it did not) (Dkt. 24 at 2), it still would not transform the purported invention into non-abstract subject-matter. In *Digitech Image Techs., LLC v. Electronics for Imag., Inc*., 758 F.3d 1344, 1348 (Fed. Cir. 2014), for example, the claims recited devices that improved image processing by adjusting both chromatic and spatial information to minimize distortion. Conventional approaches had adjusted only chromatic information. *Id*. The Federal Circuit found the use of additional data insufficient to confer eligibility because "[d]ata in its ethereal, non-physical form is simply information that does not fall under any of the categories of eligible subject matter." *Id*. at 1350. Moreover, in *PerkinElmer, Inc. v. Intema*, 496 F. App'x 65, 72 (Fed. Cir. 2012), the Court reiterated that additional "data-gathering step[s] . . . are no saving grace" under §101. The claims in *PerkinElmer* recited "use of data from both the first and second trimesters of pregnancy in combination." *Id.* at 72. "[O]nly one marker was previously used." *Id*. The Court held that, "[e]ven assuming it is new or even inventive, this 'two markers are better than one' concept is still a mental step or abstract idea, *i.e.*, it is ineligible subject matter." *Id*. And, in *RecogniCorp, LLC v. Nintendo Co., Ltd*., 855 F.3d 1322 (Fed. Cir. 2017), the Federal Circuit found claims for

"taking two data sets and combining them into a single data set" to form a composite image, *i.e.*,

"process that start[s] with data, add[s] an algorithm, and end[s] with a new form of data,"

directed to the abstract idea of "organizing information through mathematical correlations."  *Id.*

at 1324, 1327, citing *Digitech*, 758 F.3d 1344.  It made no difference that the patent "sought to

solve [a] problem" relating to "decreased image quality" during compression and transmission

"by encoding the image at one end through a variety of image classes that required less memory

and bandwidth."  *Id*. at 1324.

      **B.**    **The claims fail step two of the *Alice* test.**

         **1.**    **The claims do not purport to improve computers themselves.**

The claims of the '250 patent fail to recite an inventive concept.  When examining claims

to computer-implemented inventions under step two of *Alice*, Courts look for an improvement in

***computer technology itself***, *i.e.*, "a specific improvement to the way computers operate."  *Enfish*,

822 F.3d at 1336.  Here, the claims' "focus . . . is not on such an improvement in computers as

tools, but on certain independently abstract ideas [*i.e.*, collecting, organizing, and storing data to

track physical objects] that use computers as tools."  *Elec. Power*, 830 F.3d at 1354.

Plaintiff alleges that the claims are "directed to a novel 'fingerprinting' machine for

physical items" (Dkt. 24 at 2), but he does not identify anything new about the "machine" itself.

Plaintiff points to supposedly "specialized hardware," specifically, an "imaging device

configured to determine spectral analysis data and 3D scan data from measurements generated

by the item analysis components" (*id.*), which appears in independent claims 1, 12, and 22.  But

the specification of the '250 patent fails to disclose any improvement in imaging devices.  To the

contrary, the '250 patent relies exclusively on pre-existing imaging devices, such as those

disclosed in "3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects":

3D Imaging Spectroscopy is described in "3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects" (Kim, M., Harvey, T., Kittle, D., Rushmeier, H., Dorsey, J., Prum, R., Brady, D. 2012. *3D Imaging Spectroscopy for Measuring 3D Hyperspectral Patterns on Solid Objects*. ACM Trans. Graph. 31 4, Article 38 (July 2012), incorporated herein by reference)

Spectral imager 208 (spectroradiometer) assesses the asset's spectral hypercube data, identifying irregularities in composition of the asset, notably the radiometric measurements at various spatial frequencies. Such measurements are as described in the paper *3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects*.

Laser projector and laser receiver 210 (laser range scanner) assesses the 3D spatial data of the object, and geometric irregularities (which may include items such as inclusions in gemstones). Such measurements are also described in the paper *3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects*.

(Dkt. 30 Ex. A at 8:24-31 (emphasis original).)  The specification thus cites the same reference for the hardware required to generate and use ***both*** spectral analysis data and 3D scan data.[3]  This is fatal to Plaintiff's argument that the inventive concept resides in some (unspecified) "combination of old elements" (Dkt. 24 at 2), as that reference expressly discloses a system that pre-dates the filing of the '250 patent and ***combines*** spectral analysis data with 3D scan data to identify physical objects:

Our 3D imaging spectroscopy (3DIS) system ***measures 3D geometry and hyperspectral radiance simultaneously***. . . . More faithful representations of surface reflectance are crucial to many applications besides our motivating example of avian vision.  In addition to birds, we consider example ***applications***

---

[3] "The Court can consider documents that the '250 patent purports to incorporate by reference at the pleadings stage.  *See Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006) (explaining that incorporation by reference "provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein") (citation omitted).  Even if the Court declines to consider those documents, however, it still should grant De Beers's motion because the admissions within the four corners of the specification suffice to find the claimed features conventional as a matter of law.

> *in geology* and cultural heritage.  In both of these applications accurate spectral signatures are valuable in the ***analysis and identification of materials***.

(Ex. A at 38:1 (emphasis added).)[4]  Thus, neither the individual nor combined elements of the claims recite any improvement to an "imaging device."

Nor do the claims overcome any problem that exists only in the realm of computers. Instead, the claims allegedly address the general "problem of establishing a unique 'fingerprint' for physical items."  (Dkt. 24 at 2.)  *See Virginia Inn. Scis., Inc. v. Amazon.com, Inc*., 227 F. Supp. 3d 582, 596 (E.D. Va. 2017) (distinguishing "narrow and 'computer-centric'" problems from a "generalized problem" of reproducing a video on a display.), *aff'd*, 718 F. App'x 988 (Fed. Cir. 2018).  And the Federal Circuit has consistently held claims directed to "fingerprinting," *e.g*., using classification data to uniquely identify objects, ineligible.  In *TLI*, for example, the asserted patent involved "assigning 'classification data,' such as a date or timestamp, to digital images and sending those images to a server."  823 F.3d at 610.  The Court held that "attaching classification data, such as dates and times, to images for the purpose of storing those images in an organized manner is a well-established" patent-ineligible abstract concept.  *Id*. at 613-15.  As Courts have repeatedly recognized, "[s]electing files based on identifiers and ***matching different files/identifiers is just what computers do.  There is nothing inventive about it***."  *Intellectual Ventures I LLC v. Erie Indemnity Co*., 200 F.Supp.3d 565, 576 (W.D. Pa. 2016) (emphasis added), *aff'd*, 711 F. App'x 1012, 1018-19 (Fed. Cir. Nov. 3, 2017) (rejecting argument that claims "recite novel file identification software that analyzes and identifies files in unconventional ways—applying three specific selection criteria and then performing a ***digital-signature-based lookup process***" because that "file identification"

---

[4] "Ex." refers to an exhibit the declaration of Joshua D. Calabro, submitted herewith.

amounted to a "generic" computer function) (emphasis added); *see also Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313-14 (Fed. Cir. 2016) ("[R]eceiving e-mail (and other data file) identifiers, characterizing e-mail based on the identifiers, and communicating the characterization—in other words, filtering files/e-mail—is an abstract idea.").

      Even if Plaintiff's "fingerprinting" were new, it would not change the result. Because Plaintiff points to no new hardware, any novelty must reside in the collection, processing, and storage of data. But, as discussed in Section III(A)(1), above, that manipulation of data is an abstract concept, and "the inventive concept necessary at step two of the []*Alice* analysis cannot be furnished by the unpatentable . . . abstract idea[] itself." *Genetic Techs*, 818 F.3d at 1376; *Parker v. Flook*, 437 U.S. 584, 591-92 (1978) (disregarding the "novelty" of the abstract idea, which "is treated [under § 101] as though it were a familiar part of the prior art").

      Finally, the "blockchain" that appears in independent claims 1, 12, and 22 does not furnish an inventive concept for at least two independent reasons. First, the specification makes clear that blockchains were known. (*See, e.g.,* Dkt. 30 Ex. A at 1:7-18 (discussing blockchains as background to the invention); *id* at 7:46-57 (incorporating by reference an article regarding blockchains that pre-dates the filing of the '250 patent).) Second, the specification explains that blockchains implement a "ledger." (*See, e.g.,* Dkt. 30 Ex. A at 1:6-10, 3:1-4, 5:47-52.) And ledgers are abstract ideas, which cannot provide an inventive concept. *Genetic Techs*, 818 F.3d at 1376; *Parker*, 437 U.S. at 591-92.

      For example, in *Alice*, the Supreme Court found a claim for creating "account ledgers" directed to abstract idea. 134 S. Ct. at 2352. Moreover, like the claims at-issue in *Alice*, the claims here use a ledger for mitigating risk (*i.e.*, ensuring "reliability of trust evaluation") in transactions. (Dkt. 30 Ex. A at 10:57-59); *Alice*, 134 S. Ct. at 2352 ("At the end of the day, the

intermediary instructs the relevant financial institutions to carry out the 'permitted' transactions in accordance with the updated shadow records, *ibid.*, thus mitigating the risk that only one party will perform the agreed-upon exchange.").  As the Supreme Court explained in *Alice*, these "fundamental economic practice[s]" and other "method[s] of organizing human activity" are abstract ideas.  *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 982 (Fed. Cir. 2017), quoting *Alice*, 134 S. Ct. at 2356-57.  Similarly, in *Bozeman*, the claims were "directed to methods for authorizing and clearing financial transactions to detect and prevent fraud."  955 F.3d at 976. They recited, among other things, receiving records from financial transactions and determining whether certain parameters of those records matched.  *Id.* at 976-77.  The Federal Circuit affirmed the decision finding those claims "directed to the abstract idea of 'collecting, displaying, and analyzing information to reconcile [it] against a ledger.'" *Id.* at 977 (citation omitted); *see also id*. at 979 (explaining that "humans have always performed these functions").

Indeed, the Patent Trial and Appeal Board of the United States Patent and Trademark Office has recently found claims ineligible under § 101 notwithstanding their invocation of a "blockchain."  *See* Ex. B [*Ex Parte Praveen Jayachandran*, Appeal No. 2019-007020, Application No 15/294,272 (P.T.A.B. May 13, 2020)] at 12 (rejecting argument that claims' "'implement[ation] [of] a new process for tracking assets . . . in a blockchain' satisfies *Alice*"); Ex. C [*Ex Parte Steven Charles Davis*, Appeal No. 2019-002664, Application No 14/718,930 (P.T.A.B. Sept. 1, 2020)], at 11 ("No matter how much of an advance in the field of processing blockchain transactions claim 1 recites, the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm.").

## 2.   The dependent claims do not recite an inventive concept.

None of the dependent claims of the '250 patent adds an inventive concept.

Claims 2, 3, 13, and 14 recite hardware, such as a "cabinet," "light source," "calibration target," and "mechanism of movement." Plaintiff does not allege that the hardware in these claims embodies an inventive concept. Nor could he, as the specification lacks any disclosure that could support new hardware. To the contrary, the specification expressly concedes that many of the physical components in the claims were known, as disclosed in "3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects":

> Xenon light source 212 provides broad spectrum (flat and uniform) illumination on the asset as described in the paper *3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects*. . . .
>
> A calibration target 214 is useful to determine the geometric relationship between the range scanner and the imager as described in the paper *3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects*. . . .
>
> A motorized turntable or gantry 216 provides a mechanism of movement (motorized base which an asset may be placed on, or a gantry which allows the movement of the 3DIS system described in *3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects, for large assets*)—this allows a 360-degree rotation around the specified asset.

(Dkt. 30 Ex. A at 8:44-58 (emphasis original).)

Claims 4, 5, 6, 15, 16, and 17 relate to the use of "proof of identity" data and "reputational data . . . maintained and provided for use in accordance with a Blockchain Authentication and Trust Module (BATM) framework," which the specification admits were known, as disclosed in "Blockchain based trust & authentication for decentralized sensor networks":

> The three cryptographic hashes are included as part of the payload along with any other required items from the Blockchain Authentication and Trust Module (BATM) framework such as Node ID and ***reputation data*** as listed in "Blockchain based trust & authentication for decentralized sensor networks" (Moinet, A., Darties, B. and Baril, J.-L., Blockchain based trust & authentication for decentralized sensor networks, arXiv:1706.01730v1 [cs.CR] 6 Jun. 2017)", incorporated herein by reference in its entirety, or any such framework for a decentralised trust authentication between network nodes and the proof location payloads listed in *Blockchain for Peer-to-Peer Proof-of-Location*. . . .

-14-

> **Proof of identity**: is discussed in *Blockchain based trust & authentication for decentralized sensor networks*, section 3. In brief, BATM associates cryptographic keys with each Network Node (NN)—e.g. a miner, witness node, or full-node, and Available Services (AS) in the network.

(Dkt. 30 Ex. A at 7:46-57, 9:41-45 (bold emphasis added).)

Claim 11 relates to the measurement of "physical features comprising any of anomalies, defects, imperfections, noise and geometric irregularities," which the specification admits was known, as disclosed in http://www.jewelry-secrets.com/Blog/black-spots-in-diamonds:

> Diamonds have a unique property which is that they have carbon imperfections/carbon flaws. These flaws are unique in 3D space in the diamond's shape and type. Further general information on same is available at http://www.jewelry-secrets.com/Blog/black-spots-in-diamonds/, incorporated herein by reference in its entirety.

(Dkt. 30 Ex. A at 3:54-59.)  And, the cited website expressly describes the use of those measurements to determine if a physical item matches a previously-recorded physical item:

> Black Spots, or more commonly referred to as, Black Carbon Spots, are Crystal Inclusions that formed in a Diamond when the Diamond was born. . . The good thing about Black Spots is the fact that they're easy to spot, memorize and identify.  You can **check them with the Diamond Plot on your Certificate and match up the flaws** . . . . Knowing where your Inclusions are and what they look like will allow you to scope your Diamond anytime, anywhere and **know that Diamond is yours**."

(Ex. D (emphasis added).)

Claims 9, 20, and 23 relate to nodes that communicate using "short range communications," which the specification admits were known, as disclosed in "Blockchain for Peer-to-Peer Proof-of-Location":

> Short range communication component 226 (such as Bluetooth, Bluetooth SMART or ZigBee, Wi-Fi Direct or any other short range network communication mechanism), which will periodically transmit proof-of-location requests and responses as described in *Blockchain for Peer-to-Peer Proof-of-Location. Communication* system 228 provides Wide Area Network—WAN communication such as network communication capabilities—a method of communicating over long distances via Internet communications to communicate with other nodes as described in *Blockchain for Peer-to-Peer Proof-of-Location.*

> *Communication* system 228 may comprise one or more antennas and one or more wired communications maybe provided to give communication abilities via short range communications and internet (WAN) communications.

(Dkt. 30 Ex. A at 9:18-33 (emphasis original); *see* Ex. E [Blockchain for Peer-to-Peer Proof-of-Location] at 3 (discussing a "peer-to-peer network with mobile nodes that are connected to the Internet through the WiFi or cellular network interface, and are able to interact with neighboring nodes through short-range communication technologies such as Bluetooth.").)

Claims 7, 8, 18, and 19 recite a "location determination device" relating to the provision of "proof of location" to a peer-to-peer network, which the specification admits was known, as disclosed in "Blockchain for Peer-to-Peer Proof-of-Location":

> Peer-to peer proof of location is further described in *Blockchain for Peer-to-Peer Proof-of-Location* (Brambilla, G., Amoretti, M. and Zanichelli, F., Using Blockchain for Peer-to-Peer Proof-of-Location, arXiv:1607.00174v2 [cs.DC] 31 Jul. 2017) incorporated herein by reference in its entirety. . . .

> The components that follow, are useful to the meta-data location tracking of an asset which acts as a method of traceability of the asset: Location based services (LBS) device (such as a GPS tracker 224)—allows for the transmission of geolocation data (GPS data) as described in *Blockchain for Peer-to-Peer Proof-of-Location*.

(Dkt. 30 Ex. A at 7:20-25, 9:13-18 (emphasis original); *see* Ex. E [Blockchain for Peer-to-Peer Proof-of-Location] at 1 ( "Location-Based Services (LBSs) build upon geographic information to provide users with location-dependent functionalities. In such a context, it is particularly important that geographic locations claimed by users are the actual ones. . . . In this paper, we present and evaluate a novel decentralized, infrastructure-independent proof-of-location scheme based on the blockchain technology.").)

Finally, claims 10 and 21 merely apply the data collecting, processing, and storing steps to a "modified physical item," which cannot provide an inventive concept because those abstract steps are treated as prior art under § 101. *See* Section III(B)(1), above. In any event, the

specification concedes that hardware and software for generating and analyzing data on modified

physical items, *e.g.*, polished diamonds, were known, as disclosed in

http://www.ogisystems.com/ scanoxplanner-diamond-planning.html:

> [T]he jeweler/client may wish to modify the diamond by processing or reshaping
> it . . . . If a diamond is mined, one can cut/polish/clean one side of the diamond
> (although it is possible to apply a similar technique to rough stones as mentioned
> here: http://www.ogisystems.com/scanoxplanner-diamond-planning.html),/,
> incorporated herein by reference in its entirety.

(Dkt. 30 Ex. A at 4:15-19.)  The cited website discloses hardware and software for

"[m]easuring, [p]lanning and [g]rading of diamonds from the rough stone up to the

brilliant polished [*i.e.*, modified] diamond," including: (1) an "HD digital camera for

accurate mapping of the rough surface and identification of the smallest inclusions"; and

(2) "[a]dvanced algorithms [that] automatically analy[z]e different cut grades, shapes,

clarity grades and inclusion positions."  (*See* Ex. F.)

### 3. No disputed facts preclude finding that the claims lack an inventive concept at this stage.

There is no reason for the Court to defer finding that the claims lack an inventive

concept.  District Courts frequently resolve patent-eligibility at the pleading stage, and

the Federal Circuit has repeatedly affirmed that practice.  *See Epic IP LLC v. Backblaze,

Inc.*, 351 F. Supp. 3d 733, 751 (D. Del. 2018) (Bryson, J., sitting by designation)

("District courts have frequently decided section 101 issues on motions to dismiss, and

the Federal Circuit has approved of that procedure on numerous occasions . . . .") (citing

cases).  Plaintiff's arguments to delay addressing the issue pending discovery or claim

construction in this case are unavailing.

There are no factual disputes that bear on the existence of an inventive concept.

Citing *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019), Plaintiff

suggests that the Court cannot resolve subject matter eligibility at this stage in view of (unspecified) disputed facts bearing on an alleged inventive concept. (Dkt. 24 at 2.) But *Cellspin* is inapposite because the Court there "ha[d] no basis, at the pleadings stage, to say that these claimed techniques, among others, were well-known or conventional as a matter of law." 927 F.3d at 1318. Here, by contrast, the specification of the '250 patent itself confirms that the claims recite conventional and well-known concepts. As discussed in Sections III(B)(1) and (2), above, those admissions foreclose any argument that the claims recite an inventive concept. *Intellectual Ventures I LLC v. Symantec Corp.*, 725 F. App'x 976, 978 n.1 (Fed. Cir. 2018) ("[T]he specification confirms that the individual components . . . are conventional, generic, and operate as expected.") (citation omitted).

There are no claim construction issues that bear on the existence of an inventive concept. Citing *Baxter Healthcare Corp. v. Becton, Dickinson* & Co., No. 17-CV-2186 JLS (RBB), 2018 WL 6220132 (S.D. Cal. Sept. 5, 2018), Plaintiff contends that "claim construction is a prerequisite [for] determining whether the claims define an inventive concept" (Dkt. 24 at 2-3), which is wrong; courts routinely resolve subject matter eligibility prior to claim construction. *See Epic*, 351 F. Supp. 3d at 751-52. In *Baxter*, plaintiff established that the claim term "dose preparation station" needed construction, and defendant failed to show that this feature was well known in the art. *Baxter*, 2018 WL 6220132, at *18. Here, by contrast, Plaintiff does not and cannot identify any claim term whose construction would impact patent-eligibility and, in fact, the '250 patent concedes that the claimed features were well known and conventional. *See, e.g., Epic*, 351 F. Supp. 3d at 752 (granting motion to dismiss and holding claims patent-ineligible

-18-

where patentee "ha[d] not pointed to any claim construction issue that would alter the

Court's judgment as to the disposition of the section 101 motion").

**IV.**    **<u>Conclusion</u>**

    For the foregoing reasons, the Court should grant De Beers's motion to dismiss.


    Dated: October 5, 2020

                                    Respectfully submitted,

                                    <u>/s/ Christopher P. Borello</u>
                                    Christopher P. Borello
                                    Joshua D. Calabro
                                    VENABLE LLP
                                    1270 Avenue of the Americas
                                    New York, New York 10020
                                    Telephone: (212) 218-2100
                                    Facsimile: (212) 218-2200
                                    Email: cborello@venable.com
                                    Email: jdcalabro@venable.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2020, a copy of the foregoing will be served on

counsel of record for all parties via ECF.


/s/ Christopher P. Borello
Christopher P. Borello